SEARS ROEBUCK AND CO., Plaintiff v. BARBARA AVERY, Defendant

No. COA02-925

(Filed 16 March 2004)

**1. Appeal and Error— appealability—interlocutory order— order denying arbitration**

Although the appeal from an order denying arbitration is an appeal from an interlocutory order, it is immediately appealable because it affects a substantial right.

**2. Arbitration and Mediation— motion to compel—credit card agreement**

The trial court did not err by denying plaintiff company's motion to compel arbitration even though plaintiff contends it validly added an arbitration provision to the terms of defendant's credit card agreement by mailing notice to its cardholders based on a provision in the agreement entitling the company to change any term in the agreement, because: (1) although plaintiff relies heavily on the public policy favoring arbitration, that policy is immaterial unless there is an enforceable arbitration agreement; (2) no enforceable arbitration agreement exists when, applying Arizona law, the company was only authorized by the change of terms provision to make changes relating to subjects already addressed in the original agreement and the original agreement did not contain an arbitration clause; (3) allowing plaintiff now to unilaterally insert an arbitration provision would ignore the requirement of good faith implied in all contracts of adhesion; (4) allowing plaintiff to change or amend its agreement without any limitation is not within the reasonable expectations of its cardholders and gives rise to an illusory contract; and (5) an arbitration provision is waived by conduct inconsistent with the use of the arbitration remedy, and even if the parties entered into an enforceable arbitration agreement based on Arizona law, plaintiff has waived the right to compel arbitration when plaintiff made a tactical decision to file suit rather than seek arbitration and only moved to compel arbitration after plaintiff learned that its tactical decision was not in fact advantageous.

Appeal by plaintiff from order entered 2 April 2002 by Judge A. Leon Stanback, Jr. in Wake County Superior Court. Heard in the Court of Appeals 26 March 2003.

*Womble Carlyle Sandridge & Rice, P.L.L.C., by Douglas W. Hanna, for plaintiff-appellant.*

*Wilmer, Cutler & Pickering, by Christopher R. Lipsett, Daniel H. Squire and Michael D. Leffel, for plaintiff-appellant.*

*Robert P. Holmes, for defendant-appellee.*

*Webb & Webb, by William D. Webb, for defendant-appellee.*

GEER, Judge.

The primary issue before this Court is whether plaintiff, Sears Roebuck and Co. ("Sears"), validly added an arbitration provision to the terms of defendant Barbara Avery's Sears credit card agreement. While Sears, in arguing that it is entitled to compel arbitration, relies upon a provision in its cardholder agreement allowing it to change any term of the agreement, we hold, applying Arizona law, that Sears was only authorized by that provision to make changes relating to subjects already addressed in the original agreement. Because Sears' arbitration clause did not fall into that category and because Sears has, in any event, waived its right to compel arbitration, we affirm the trial court's denial of Sears' motion to compel arbitration.

### Facts

The undisputed facts show that Ms. Avery opened a credit card account with Sears in 1983. In March 1995, that account was transferred to Sears National Bank ("SNB"), a Sears subsidiary. Although Ms. Avery's cardholder agreement with SNB was ten pages long and contained 37 separate provisions (not including a statement of rights under the Fair Credit Billing Act), it made no reference to arbitration or any other dispute resolution procedures and did not in any manner address the forum in which a customer could have disputes resolved. The agreement also contained a "Change of Terms" provision stating (emphasis original): "As permitted by law, SNB has the right to change any term or part of this agreement, including the rate of *Finance Charge*, applicable to current and future balances. SNB will send me a written notice of any such changes when required by law."

In July or August 1999, SNB sent a 12-page notice of changes to the cardholder agreement to most of its cardholders.[1] SNB's records indicate that SNB sent this notice to Ms. Avery; Ms. Avery's affidavit

---

1. Arkansas cardholders and certain other specified cardholders (such as those in bankruptcy) did not receive the notice.

stated that she was unaware of any correspondence regarding changes to her account. The SNB notice highlighted certain changes to the account, including the addition of an arbitration provision, noting that "[a]t present, there is no such arbitration provision for your Account." The notice announced that the changes would "become effective 30 days from your receipt of this notice, unless you notify us in writing before that date . . . that you wish to reject the new Agreement." The notice instructed the cardholder that if she provided notice that she did not agree to the changes, she "may pay any outstanding balance under the terms currently governing [her] Account."

Within the body of the new cardholder agreement, section 22 provided:

> ARBITRATION. Any and all claims, disputes or controversies of any nature whatsoever (whether in contract, tort, or otherwise) arising out of, relating to, or in connection with: (a) this Agreement; (b) any prior agreement you may have had with us, Sears, the Sears Affiliates, or with any of their predecessors, successors, and assigns, or with any of the dealers, contractors, licensees, agents, employees, officers, directors and representatives of any of the foregoing entities; (c) the application for the Account, this Agreement or any prior agreement; (d) the relationships which result from this Agreement or any prior agreement (including any relationships with us, Sears or any of the Sears Affiliates); or (e) the validity, scope or enforceability of this arbitration section or this Agreement or any prior agreement (the immediately preceding subsections (a) through (e) shall be referred to in this section, collectively, as "claims"), shall be resolved, upon your election or our election, by final and binding arbitration before a single arbitrator, on an individual basis without resort to any form of class action, except that each party retains the right to seek relief in a small claims court, on an individual basis without resort to any form of class action, for claims within the scope of its jurisdiction.

The new agreement also contained detailed provisions governing the arbitration proceedings.

In addition, the new agreement altered the "Change of Terms" provision. It now specified:

We may, at any time and subject to applicable law:

- Change any Credit Limit applicable to the Account;

SEARS ROEBUCK & CO. v. AVERY

[163 N.C. App. 207 (2004)]

- Change any term or condition of this Agreement relating to your Account, including the Annual Percentage Rate applicable to outstanding and future balances, and the fees or other charges applicable to the Account; and

- *Add any new term or condition* to this Agreement relating to your Account.

Our right to change or add terms or conditions to this Agreement applies both to financial terms, such as Finance Charges and fees, and to non-financial terms, such as our enforcement rights and other contractual provisions. We may apply any changed or new terms or conditions to any current and/or future balances created after that date. We will send you a written notice of any such change(s) or addition(s) as required by law.

(Emphasis added)

On 16 April 2001, Sears filed an action against Ms. Avery in Wake County District Court to collect an outstanding balance on her account in the amount of $3,080.08. Ms. Avery moved to transfer the action to Superior Court and filed an answer and class-action counterclaim alleging that Sears' interest rate is higher than that permitted by the North Carolina Retail Installment Sales Act. Sears moved to dismiss or in the alternative to stay Ms. Avery's counterclaim pending arbitration pursuant to the 1999 arbitration provision.

The trial court denied Sears' motion, finding (1) that there was no mutual assent by the parties to arbitrate, (2) that Ms. Avery did not make any new or additional purchases on her Sears card after the mailing of the 1999 notice apart from automated, pre-authorized charges, (3) that Ms. Avery had been financially unable to pay the amount necessary to close her Sears account, and (4) that Sears had not paid any consideration in connection with the 1999 changes to the account. Based on these findings, the trial court concluded that since the parties did not mutually assent to the arbitration provision in the 1999 notice and since that provision was not supported by consideration, "[t]here is no contract requiring arbitration of the counterclaim . . . ." The trial court specifically declined to address whether the arbitration clause was unconscionable, whether the issues involved in the litigation fell within the scope of the arbitration clause, whether Sears had standing to enforce the provision, and whether Sears waived the right to compel arbitration.

SEARS ROEBUCK & CO. v. AVERY

[163 N.C. App. 207 (2004)]

Sears appealed from the trial court's decision. Ms. Avery has cross-assigned error to the trial court's failure to address unconscionability, the scope of the arbitration clause, standing, and waiver.

## Discussion

### I. Standard of Review.

[1] Although this appeal is interlocutory, this Court has held that an "order denying arbitration, although interlocutory, is immediately appealable because it involves a substantial right which might be lost if appeal is delayed." *Prime South Homes, Inc. v. Byrd*, 102 N.C. App. 255, 258, 401 S.E.2d 822, 825 (1991). Our standard of review is *de novo* "since the order appealed from is based upon contract interpretation and therefore presents a question of law." *Internet East, Inc. v. Duro Communications, Inc.*, 146 N.C. App. 401, 405, 553 S.E.2d 84, 87 (2001).

In considering a motion to compel arbitration, a court " 'must determine whether the parties agreed to arbitrate, and, if so, the scope of the arbitration agreement.' " *Tohato, Inc. v. Pinewild Mgmt., Inc.*, 128 N.C. App. 386, 390, 496 S.E.2d 800, 803 (1998) (quoting *Southwest Health Plan, Inc. v. Sparkman*, 921 S.W.2d 355, 358 (Tex. Ct. App. 1996)). We apply Arizona law since the cardholder agreement provides that "[t]his agreement . . . will be governed by and interpreted in accordance with the laws of the State of Arizona and the United States[.]" *Torres v. McClain*, 140 N.C. App. 238, 241, 535 S.E.2d 623, 625 (2000) (holding that the parties' choice of law is given effect " 'as long as they had a reasonable basis for their choice and the law of the chosen State does not violate a fundamental public policy of the state or otherwise applicable law' ") (quoting *Behr v. Behr*, 46 N.C. App. 694, 696, 266 S.E.2d 393, 395 (1980)).

### II. The Relevance of Public Policy Favoring Arbitration.

[2] While both federal and Arizona public policy favor arbitration, this public policy does not come into play unless a court first finds that the parties entered into an enforceable agreement to arbitrate. As the United States Supreme Court has stressed, "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 131 L. Ed. 2d 985, 993, 115 S. Ct. 1920, 1924 (1995) (emphasis added). *See also Mastrobuono v.*

*Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57, 131 L. Ed. 2d 76, 84, 115 S. Ct. 1212, 1216 (1995) (quoting *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479, 103 L. Ed. 2d 488, 500, 109 S. Ct. 1248, 1256 (1989)) (arbitration under the Federal Arbitration Act is a matter of " 'consent, not coercion' "); *DIRECTTV, Inc. v. Mattingly*, 376 Md. 302, 321, 829 A.2d 626, 638 (2003) ("We never reach the questions controlled by the [Federal Arbitration Act] because we hold that there was never a valid agreement to arbitrate . . . .").

The Arizona Court of Appeals has similarly stated that the public policy in favor of arbitration "presupposes the existence of a valid agreement to arbitrate. Only when the arbitration provision is enforceable will the court compel arbitration." *Stevens/Leinweber/Sullens, Inc. v. Holm Dev. & Mgmt., Inc.*, 165 Ariz. 25, 30, 795 P.2d 1308, 1313 (Ct. App. 1990). *See also Broemmer v. Abortion Servs. of Phoenix, Ltd.*, 173 Ariz. 148, 153, 840 P.2d 1013, 1018 (S. Ct. 1992) ("When agreements to arbitrate are freely and fairly entered, they will be welcomed and enforced. They will not, however, be exempted from the usual rules of contract law . . . ."). Although Sears relies heavily on the policy favoring arbitration, that policy is immaterial unless this Court first finds that an enforceable arbitration agreement exists under Arizona law.

III. The Existence of an Enforceable Agreement to Arbitrate.

It is undisputed that Ms. Avery's original cardholder agreement with Sears did not contain an arbitration clause. Sears, however, purported to amend that agreement to add an arbitration clause by mailing notice to the cardholders pursuant to the existing "Change of Terms" provision. The question before this Court is whether Sears could, consistent with Arizona law, unilaterally add an arbitration clause to its shareholder agreement by simply mailing notice to its cardholders. *See DIRECTTV, Inc.*, 376 Md. at 311, 829 A.2d at 631 ("While the arbitration clause and its applicability to the instant dispute provides the shell of the case *sub judice*, arbitration is merely a context for the threshold issue—the interpretation of a provision within a contract that did not contain an arbitration clause[,] the initial customer agreement. Our decision, therefore, rests solely upon this Court's interpretation of Maryland contract law and not on principles set forth within the substantive law of arbitration.").

The Arizona Supreme Court has recognized that "the enforceability of the agreement to arbitrate is determined by principles of

general contract law." *Broemmer*, 173 Ariz. at 150, 840 P.2d at 1015. Ariz. Rev. Stat. § 12-1501 (2003) provides:

> A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract.

"Grounds in equity or law for revocation of a contract include an allegation that the contract is void for lack of mutual consent, consideration or capacity or voidable for fraud, duress, lack of capacity, mistake, or violation of a public purpose." *U.S. Insulation, Inc. v. Hilro Constr. Co.*, 146 Ariz. 250, 253, 705 P.2d 490, 493 (Ct. App. 1985) (reviewing agreement to arbitrate).

A. *Authority from Jurisdictions Other Than Arizona.*

Arizona's appellate courts have not squarely addressed the issue presented by this appeal. The California Court of Appeals has, however, in *Badie v. Bank of America*, 67 Cal. App. 4th 779, 79 Cal. Rptr. 2d 273 (1998), applied general contract principles to the identical question presently before this Court. In *Badie*, the cardholder agreement did not include an arbitration agreement, but the Bank attempted to amend that agreement to add an arbitration provision by sending notice of the change in a bill stuffer pursuant to a provision permitting the Bank to "Change or Terminate Any Terms, Conditions, Services or Features of [the] Account (Including Increasing [the] Finance Charges) at Any Time." *Id.* at 786, 79 Cal. Rptr. 2d at 278.

The California Court of Appeals held, relying upon California contract law:

> [A]fter analyzing the credit account agreements in light of the standard canons of contract interpretation, we conclude that when the account agreements were entered into, the parties did not intend that the change of terms provision should allow the Bank to add completely new terms such as an ADR clause simply by sending out a notice. Further, to the extent that application of these canons of construction has not removed all uncertainty concerning the meaning of the provision, we resort to the rule that ambiguous contract language must be interpreted most strongly against the party who prepared it . . ., a rule that applies with particular force to the interpretation of contracts of adhesion, like the account agreements here. . . . Application of this

rule strengthens our conviction that the parties did not intend that the change of terms provision should permit the Bank to add new contract terms that differ *in kind* from the terms and conditions included in the original agreements.

*Id.* at 803, 79 Cal. Rptr. 2d at 289 (emphasis original). The *Badie* court concluded that the arbitration clause "is not a part of the Bank's contract with the four individual plaintiffs here and may not be enforced against them." *Id.* at 807, 79 Cal. Rptr. 2d at 291.

Our review of Arizona appellate decisions regarding standardized contracts and modification of contracts has revealed that Arizona courts apply the same principles and analyses relied upon by the California court in *Badie*. We conclude, therefore, that the Arizona appellate courts would adopt the same reasoning as the *Badie* court and would reach the same result.

In seeking to overturn the trial court's order denying arbitration, Sears cites only a solitary decision from Arizona that does not address the pertinent issues on this appeal. We do not believe that the decisions from other jurisdictions relied upon by Sears reflect what Arizona courts would do faced with these circumstances.

With respect to the cited decisions addressing the authority of a credit card company to use a "Change of Terms" provision to unilaterally add an arbitration clause, those opinions rely upon state statutes interpreted to specifically authorize that conduct. *See, e.g.*, *Fields v. Howe*, No. IP-01-1036-C-B/S, 2002 WL 418011 (S.D. Ind. Mar. 14, 2002) (unilateral addition of arbitration clause authorized by 5 Del. C. § 952(a) (2003)); *Bank One, N.A. v. Coates*, 125 F. Supp. 2d 819, 831 (S.D. Miss. 2001) (unilateral addition of arbitration clause "specifically authorize[d]" by Ohio Rev. Stat. § 1109.20(D)), *aff'd*, 34 Fed. Appx. 964, 2002 U.S. App. LEXIS 7759 (5th Cir., 5 Apr. 2002); *SouthTrust Bank v. Williams*, 775 So. 2d 184, 190 (Ala. 2000) (holding that the Alabama legislature in enacting Ala. Code § 5-20-5 "provided a procedure that differs in no material respect from the one [the credit card company] followed in this case"). Since Sears has cited no comparable Arizona statute and we have not found one, these decisions are not persuasive.[2]

---

2. In *Gaynoe v. First Union Corp.*, 153 N.C. App. 750, 754-55, 571 S.E.2d 24, 27 (2002) (applying Georgia law), *disc. review denied*, 356 N.C. 671, 577 S.E.2d 118 (2003), cited by Sears, this Court did not address the issues presented by this appeal, but rather held that when a cardholder had successfully sought an amendment to his interest rate, he could not then argue that the bank was bound by the original interest rate. Sears also relies upon a decision from the United States District Court for the

Sears has also cited three decisions involving its own cardholder agreement. One of those decisions, *Rule v. Sears, Roebuck & Co.*, Civ. A. No. 3:00-cv-390WS (S.D. Miss. Mar. 30, 2001), cites no Arizona cases. Indeed, on the critical issue, it cites no cases at all. In *Hutcherson v. Sears Roebuck & Co.*, 342 Ill. App. 3d 109, ——, 793 N.E.2d 886, 892 (2003), the Illinois Court of Appeals, in determining that Sears could unilaterally amend its cardholder agreement to add an arbitration clause, relied on the same decisions cited by Sears in this case applying inapplicable state statutes. With respect to *Vigil v. Sears Nat'l Bank*, 205 F. Supp. 2d 566 (E.D. La. 2002), we respectfully disagree with its limited analysis of Arizona decisions.

B. *Arizona Law Governing Contracts of Adhesion.*

There is no dispute that Sears' cardholder agreement is a contract of adhesion. The Arizona Supreme Court has held:

> An adhesion contract is typically a standardized form "offered to consumers of goods and services on essentially a 'take it or leave it' basis without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or services except by acquiescing in the form contract."

*Broemmer*, 173 Ariz. at 150, 840 P.2d at 1015 (quoting *Wheeler v. St. Joseph Hosp.*, 63 Cal. App. 3d 345, 356, 133 Cal. Rptr. 775, 783 (1976)).

The *Broemmer* court, noting that Arizona follows the Restatement (Second) of Contracts § 211 ("Standardized Agreements"), *id.* at 152, 840 P.2d at 1017, held that "[t]o determine whether [a] contract of adhesion is enforceable, we look to two factors: the reasonable expectations of the adhering party and whether the contract is unconscionable." *Id.* at 151, 840 P.2d at 1016. Quoting a California decision, the Arizona Supreme Court explained further:

> "Generally speaking, there are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof. The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or 'adhering' party will not be enforced against him. . . . The second—a prin-

Western District of North Carolina, *Goetsch v. Shell Oil Co.*, 197 F.R.D. 574 (W.D.N.C. 2000). This decision, applying Delaware law, expressly distinguished the situation present in this case, "involv[ing] a credit card agreement containing no arbitration clause which was later unilaterally modified to include one." *Id.* at 577-78.

ciple of equity applicable to all contracts generally—is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or 'unconscionable.' "

*Id.* at 151, 840 P.2d at 1016 (quoting *Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 820, 171 Cal. Rptr. 604, 612, 623 P.2d 165, 172-73, (1981)). The court flatly held: "Contracts of adhesion will not be enforced unless they are conscionable and within the reasonable expectations of the parties." *Id.* at 153, 840 P.2d at 1018.

In *Broemmer*, the Arizona Supreme Court applied these principles to hold that an arbitration clause included in a standardized contract by a medical clinic was not enforceable. The court held that "there was no conspicuous or explicit waiver of the fundamental right to a jury trial or any evidence that such rights were knowingly, voluntarily and intelligently waived. The only evidence presented compels a finding that waiver of such fundamental rights was beyond the reasonable expectations of plaintiff." *Id.* at 152, 840 P.2d at 1017.

The comments to the Restatement (Second) of Contracts 2d § 211 (1981) note the value of standardized agreements. *Id.* cmt. a.[3] It points out that "[o]ne of the purposes of standardization is to eliminate bargaining over details of individual transactions, and that purpose would not be served if a substantial number of customers retained counsel and reviewed the standard terms." *Id.* cmt. b. Consistent with that purpose, "[c]ustomers do not in fact ordinarily understand or even read the standard terms. They trust to the good faith of the party using the form and to the tacit representation that like terms are being accepted regularly by others similarly situated." *Id.* Nevertheless, the Restatement recognizes the abuse that may occur and states that although standard terms are generally enforced "they are construed against the draftsman, and they are subject to the overriding obligation of good faith and to the power of the court to refuse to enforce an unconscionable contract or term." *Id.* cmt. c (internal citations omitted). Further, customers "are not bound to unknown terms which are beyond the range of reasonable expectation." *Id.* cmt. f.

In *Darner*, the Arizona Supreme Court applied this section of the Restatement to hold that recognition of the practical necessities of

---

3. *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 392, 682 P.2d 388, 397 (S. Ct. 1984) expressly adopted the analysis contained in the comments to this section of the Restatement.

standardized contracts "stops short of granting the drafter of the contract license to accomplish any result. [Contract law] *holds the drafter to good faith and terms which are conscionable*; it requires drafting of provisions which can be understood if the customer does attempt to check on his rights; *it does not give effect to boilerplate terms which are contrary to either the expressed agreement or the purpose of the transaction* as known to the contracting parties." 140 Ariz. at 394, 682 P.2d at 399 (emphasis added).

Under *Broemmer* and *Darner,* we are thus required to determine whether the unilateral addition of an arbitration clause to Sears' cardholder agreement pursuant to its "Change of Terms" provision was within the reasonable expectation of the cardholders and in compliance with the requirement of good faith.

C. *Arizona Law Governing Provisions Authorizing Unilateral Changes.*

Sears argues in support of its arbitration clause that it used a common method of credit card companies for modifying the terms of their agreements with their cardholders. According to Sears, the provision in its cardholder agreement allowing it, "[a]s permitted by law," to "change any term or part of this agreement" granted Sears the right to make any change, addition, or modification it wished, without limitation, to the cardholder agreement. We believe Arizona courts would conclude that such a construction is not consistent with good faith and is not within the reasonable expectations of cardholders.

In *Demasse v. ITT Corp.*, 194 Ariz. 500, 984 P.2d 1138 (S. Ct. 1999), the Arizona Supreme Court addressed a provision in an employee handbook that granted the employer the right to amend, modify, or cancel the handbook or any of the policies, rules, procedures, or programs outlined in the handbook. The handbook had originally contained a lay-off policy that was enforceable, according to the Arizona Supreme Court, as an implied-in-fact contract. *Id.* at 506, 984 P.2d at 1144. The defendant employer contended that the "right to amend" provision permitted it to unilaterally change the lay-off policy. The court disagreed, holding that "as with other contracts, an implied-in-fact contract term cannot be modified unilaterally." *Id.*

The *Demasse* court noted that "[n]othing could be more illusory" than to allow a party to unilaterally amend a contract based on a pro-

vision such as the one in the handbook. *Id.* at 508, 984 P.2d at 1146. The court elaborated with reasoning equally applicable here:

> We do not agree that a party to a contract containing a term that proves to be inconvenient, uneconomic, or unpleasant should have the right, like an administrative agency, to change the rules prospectively through proper procedures. . . . Self-interest may certainly provide a party with a legitimate business reason to request assent to a contract change, but the law has never before permitted unilateral change or excused non-performance of a contract on such a ground.

*Id.* at 511-12, 984 P.2d at 1149-50 (internal quotation marks omitted).

One commentator has suggested, similarly to the *Demasse* analysis, that a breach of the requirement of good faith occurs "when discretion is used to recapture opportunities forgone upon contracting . . . ." Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv. L. Rev. 369, 373 (1980). Consistent with good faith, a party may exercise a discretionary power "for any purpose within the reasonable contemplation of the parties at the time of formation—to capture opportunities that were preserved upon entering the contract, interpreted objectively." *Id.* This view of unilateral changes to contracts is consistent with the definition of bad faith set out in the Restatement (Second) of Contracts 2d § 205 cmt. d (1981). That comment lists as an example of bad faith the "abuse of a power to specify terms . . . ." *Id.* cmt. d. The *Badie* court relied upon these principles in holding that

> [w]here . . . a party has the unilateral right to change the terms of a contract, it does not act in an 'objectively reasonable' manner when it attempts to 'recapture' a forgone opportunity by adding an entirely new term which has no bearing on any subject, issue, right, or obligation addressed in the original contract and which was not within the reasonable contemplation of the parties when the contract was entered into.

*Badie*, 67 Cal. App. 4th at 796, 79 Cal. Rptr. 2d at 284 (citations omitted).

Sears' construction of its "Change of Terms" provision is inconsistent with *Demasse* and these principles. It would permit Sears to add wholly new terms to its cardholder agreement that it did not see fit to include when it first contracted with its cardholders.

**SEARS ROEBUCK & CO. v. AVERY**

[163 N.C. App. 207 (2004)]

Arbitration was, of course, a popular alternative dispute resolution procedure in 1995 when Sears adopted the original cardholder agreement at issue in this case. Even though public policy already strongly favored arbitration, Sears chose not to include an arbitration clause in its agreement. To allow Sears now to unilaterally insert such a provision would ignore the requirement of good faith implied in all contracts of adhesion.

Nor do we believe that allowing Sears to change or amend its agreement without any limitation is within the reasonable expectations of its cardholders. A customer would not expect that a major corporation could choose to disregard potential contractual opportunities and then later, if it changed its mind, impose them on the customer unilaterally.

Significantly, if we construe the "Change of Terms" provision in the manner urged by Sears, that term arguably would render the contract illusory. Other courts have likewise concluded that the power to unilaterally amend contractual provisions without limitation gives rise to an illusory contract. *See, e.g.*, *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1179 (9th Cir. 2003) ("[W]e conclude that the provision affording Circuit City the unilateral power to terminate or modify the contract is substantively unconscionable."), *cert. denied,* —— U.S. ——, —— L. Ed. 2d ——, —— S. Ct. ——, 72 U.S.L.W. 3486 (26 Jan. 2004); *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002) ("We join other circuits in holding that an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory."); *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 316 (6th Cir. 2000) (defendant's right to alter arbitration provision unilaterally "renders its promise illusory"; agreement did not therefore "constitute an enforceable arbitration agreement"), *cert. denied,* 531 U.S. 1072, 148 L. Ed. 2d 664, 121 S. Ct. 763 (2001). In fact, this principle is black letter contract law:

> One of the commonest kind of promises too indefinite for legal enforcement is where the promisor retains an unlimited right to decide later the nature or extent of his performance. This unlimited choice in effect destroys the promise and makes it merely illusory.

1 Walter H. E. Jaeger, *Williston on Contracts* § 43, at 140 (3d ed. 1957).

D. *Construction of the Sears "Change of Terms" Provision.*

In Arizona "[i]t is a long-standing policy of the law to interpret a contract whenever reasonable and possible in such a way as to uphold the contract." *Shattuck v. Precision-Toyota, Inc.*, 115 Ariz. 586, 589, 566 P.2d 1332, 1335 (S. Ct. 1977). The Restatement (Second) of Contracts 2d § 77 cmt. d (1981) recognizes that an otherwise illusory contract may be remedied because a limitation on a promisor's freedom of choice "may be supplied by law." *See also Darner*, 140 Ariz. at 394, 682 P.2d at 399 (emphasis added) (acknowledging that to enforce standardized contracts "as written, *subject to those reasonable limitations provided by law*, is to recognize the reality of the marketplace as it now exists, while imposing just limits on business practice"). We must, therefore, determine whether the Sears "Change of Terms" provision may be salvaged through a construction that imposes a limitation on Sears' ability to change or amend its cardholder agreement.

We find persuasive the approach adopted by *Badie* that permits credit card companies to rely upon "Change of Terms" provisions in their adhesion contracts insofar as the new or modified terms relate to subjects already addressed in some fashion in the original agreements. We believe that the Arizona courts would imply the same limitation with respect to the Sears "Change of Terms" provision.

In *Badie*, the court held that the requirements of objective reasonableness and good faith supply "an implied limitation on the change of term provision" restricting any modifications or additions to "the universe of terms included in the original agreements." 67 Cal. App. 4th at 797, 79 Cal. Rptr. 2d at 285. The court explained:

> The Bank's interpretation of how broadly it may exercise that right, with no limitation on the substantive nature of the changes it may make as long as it complies with the de minimis procedural requirement of "notice," virtually eliminates the good faith and fair dealing requirement from the Bank's relationship with its credit account customers[.]

*Id.* at 796, 79 Cal. Rptr. 2d at 284. Thus, while a credit card company may reserve to itself the right to amend its credit card agreements with its cardholders, it can change only those terms encompassed within the scope of the original agreement between the parties.

Even if we set aside concerns about illusoriness, reasonable expectations, and good faith, this construction is consistent with the

principle that ambiguous contracts (particularly contracts of adhesion) are construed against the drafter. *Harford v. National Life & Casualty Ins. Co.*, 81 Ariz. 43, 45, 299 P.2d 635, 637 (S. Ct. 1956) ("It is a fundamental principle of law that a contract will be construed most strongly against the drafter[.]"). *See also* Restatement (Second) of Contracts 2d § 206 cmt. a (1981) (the rule providing for construction of a contract against the drafter "is often invoked in cases of standardized contracts and in cases where the drafting party has the stronger bargaining position").

While Sears argues vigorously that the word "change" should be construed to mean "add," its own conduct recognizes that reasonable minds could differ. It chose to modify its "Change of Terms" provision to explicitly permit it to "add" as well as "change" terms. This amendment suggests that the original cardholder agreement was susceptible of either the interpretation (1) that Sears was allowed to add wholly new terms as well as modify existing terms; or (2) that Sears could only modify existing terms. It was, therefore, ambiguous. *See Mid-Century Ins. Co. v. Samaniego*, 140 Ariz. 324, 326, 681 P.2d 476, 478 (Ct. App. 1984) ("Where a policy provision is subject to more than one reasonable interpretation, it is ambiguous and the ambiguity will be construed against the insurer."). To resolve this ambiguity, the agreement should be construed against Sears as the drafter. Application of this principle results in a construction of the "Change of Terms" provision as limiting any changes to modification of existing terms—a construction that is also consistent with contract principles, reasonable expectations, and the requirement of good faith.

Thus, after carefully reviewing the record and applying Arizona case law with guidance from the Restatement (Second) of Contracts and the *Badie* court, we hold that the parties did not intend that the "Change of Terms" provision in the original agreement would allow Sears to unilaterally add completely new terms that were outside the universe of the subjects addressed in the original cardholder agreement.

E. *Sears' Lack of Authority to Add an Arbitration Clause.*

We must determine next whether the arbitration clause adopted by Sears in 1999 constitutes a modification of an existing term or falls within the universe of terms included in its original cardholder agreement. We hold that the Sears arbitration clause fails this test.

Ms. Avery's original account agreement includes no terms regarding alternative methods of or forums for dispute resolution. The closest language that addresses how conflicts will be resolved is the Statement of Credit Billing Rights which instructs cardholders how to deal with errors identified in or questions about their credit card bills. This provision does not, however, provide a forum for dispute resolution. Nothing in the original agreement would have alerted Ms. Avery that by allowing Sears to "change any term or part" of the agreement, "she might someday be deemed to have agreed to give up the right to a jury trial or to any judicial forum whatsoever." *Badie*, 67 Cal. App. 4th at 803, 79 Cal. Rptr. 2d at 289.

We cannot conclude that a cardholder's reasonable expectations would include allowing Sears to unilaterally add a term not even hinted at in the original agreement. Because the arbitration clause was a wholly new term that did not fall within the universe of subjects included in the original agreement, Sears did not have authority under its "Change of Terms" provision to condition continued use of its credit card on acceptance of the arbitration clause. The trial court properly denied Sears' motion to compel arbitration because there was no enforceable arbitration agreement.

IV. Waiver of the Right to Compel Arbitration.

Even if the parties had entered into an enforceable arbitration agreement, we hold, based on Arizona law, that Sears waived its right to enforce that agreement. Although the trial court chose not to address the issue, our research reveals that Arizona law is well-established on that question. This holding, therefore, provides an alternative basis for our decision.

The Arizona Court of Appeals has held that "[a]n arbitration provision is waived by conduct inconsistent with the use of the arbitration remedy; in other words, conduct that shows an intent not to arbitrate." *Meineke v. Twin City Fire Ins. Co.*, 181 Ariz. 576, 581, 892 P.2d 1365, 1370 (Ct. App. 1994). The court then explained what conduct qualified as a waiver: "In our view, a party's filing of a lawsuit without invoking arbitration . . . would nearly always indicate a clear repudiation of the right to arbitrate . . . ." *Id.* at 582, 892 P.2d at 1371.

The court based its holding on the Arizona Supreme Court's decision in *Bolo Corp. v. Homes & Son Constr. Co.*, 105 Ariz. 343, 464 P.2d 788 (S. Ct. 1970). In *Bolo*, the Supreme Court, relying upon Ariz. Rev.

Stat. § 12-1501, stressed that an arbitration agreement, while generally enforceable, could be avoided upon any grounds available in law or equity for the revocation of any contract. Since waiver is a valid defense to a contract, the court recognized that an arbitration clause could be waived. *Id.* at 345, 464 P.2d at 790. The court held: "[I]f either party, by his conduct can be said to have waived his right to arbitrate, the other party is placed in a position of choice: Either to compel arbitration under the contract, or to acquiesce in the waiver thereby making the revocation complete and binding on both." *Id.* The court pointed out that the plaintiff had made a tactical decision to file suit rather than seek arbitration and only moved to compel arbitration after the plaintiff learned that its tactical decision was not in fact advantageous. *Id.* at 347, 464 P.2d at 792. It held that "when this plaintiff sought redress through the courts, in lieu of the arbitration tribunal, and asked the court for exactly the same type of relief (i.e. damages), which an arbitrator is empowered to grant, it waived the right to thereafter arbitrate the controversy over the protest of the defendant." *Id.*

We hold that, even if an enforceable arbitration agreement existed, Sears has waived its right to compel arbitration. Sears' new arbitration provision excepted from arbitration only actions filed in small claims court. Sears, however, elected to sue Ms. Avery in district court for precisely the same relief that it could have obtained from an arbitrator. Moreover, Sears has only moved to compel arbitration as to Ms. Avery's counterclaim. It still intends to proceed with its collections action in district court. Under *Bolo* and *Meineke*, this conduct amounts to "a clear repudiation of the right to arbitrate[.]" *Meineke*, 181 Ariz. at 582, 892 P.2d at 1371.

### Conclusion

Because no enforceable arbitration agreement exists and, in any event, Sears has waived the right to compel arbitration, we affirm the trial court's denial of Sears' motion to compel arbitration. In light of our resolution of this appeal, we decline to address defendant's remaining cross-assignments of error.

Affirmed.

Judges TIMMONS-GOODSON and BRYANT concur.