Richardson v. Utili-Serve, LLC, 2020 NCBC 83.

STATE OF NORTH CAROLINA

CATAWBA COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 1429

JASON T. RICHARDSON; JAMES
COLE RICHARDSON; and PARKER
H. RICHARDSON,

        Plaintiffs,

    v.

UTILI-SERVE, LLC and CLIFFORD
LEE DIETRICH,

        Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTIONS TO
DISMISS AND FOR RULE 11
SANCTIONS AND ON PLAINTIFFS'
MOTION FOR SUMMARY AND
EXPEDITED RELIEF OR FOR
PRELIMINARY INJUNCTION**

1. Jason, James, and Parker Richardson are members of Utili-Serve, LLC. They suspect Utili-Serve's fourth member and only manager, C. Lee Dietrich, of self-dealing and mismanagement. To investigate, the Richardsons made a demand to inspect the company's records and audit its books. Utili-Serve mostly refused the demand, prompting the Richardsons to file this action and seek a court-ordered inspection and audit.

2. The parties have filed dueling motions. Dietrich and Utili-Serve ask the Court to dismiss the complaint and award sanctions. The Richardsons request either summary relief or a preliminary injunction requiring Utili-Serve to turn over the requested records and to permit an audit. For the following reasons, the Court **DENIES** Dietrich and Utili-Serve's motions and **GRANTS** in part and **DENIES** in part the Richardsons' motion.

> *Ellis & Winters LLP, by Curtis J. Shipley, Andrew S. Chamberlin, and Scottie Forbes Lee, for Plaintiffs Jason T. Richardson, James Cole Richardson, and Parker H. Richardson.*

*Shumaker, Loop & Kendrick, LLP, by Frederick M. Thurman, Jr., for Defendant Utili-Serve, LLC.*

*Bell Davis & Pitt, by Marc E. Gustafson, for Defendant Clifford Lee Dietrich.*

Conrad, Judge.

## I.
## BACKGROUND

3.     The following background is drawn from the allegations of the complaint and its attachments.

4.     Utili-Serve provides electrical utility services to energy suppliers. (*See* Compl. ¶ 12, ECF No. 12.) It has four members, divided into two classes. Dietrich is the sole Class A member, owns 51% of the company, and serves as its manager. The Richardsons are Class B members and collectively own the remaining 49%. (*See* Compl. ¶ 13.)

5.     Much of this dispute has to do with the difference between Class A and Class B membership. When the members revised Utili-Serve's operating agreement in 2017, they agreed that "Class A Members" (meaning Dietrich) "shall have all voting rights on all matters" and that "Class B Members" (meaning the Richardsons) "shall not have any vote in the conduct or management of the business or affairs of" Utili-Serve. (Compl. Ex. 1 § 2.1 ("*Member*"), ECF No. 3.1 ["Op. Agrmt."].) In another section, they further agreed that "no amendment to this Agreement . . . will be valid or binding . . . unless in writing and signed by the Manager and by the Members holding at least a Majority in Interest of the Class A Members" (again meaning Dietrich). (Op. Agrmt. § 11.4.)

6.     Though not allowed a say in company management, Class B members retained the right to their share of distributions and a limited right to transfer their interests.  (*See* Op. Agrmt. §§ 7.1, 8.1.)  They also gained broad inspection and audit rights.  Section 11.1 allows that "[e]ach Member, at such Member's expense, may inspect and make copies of the records maintained by the Company and may require an audit of the books of account maintained by the Company to be conducted by independent accountants for the Company."  (Op. Agrmt. § 11.1.)

7.     Controversy flared up in late 2019.  The Richardsons began questioning Dietrich about suspected self-dealing and other mischief, which he denies.  (*See* Compl. ¶ 16.)  Then Dietrich proposed changing the company's tax status, drawing a protest from the Richardsons that doing so would run afoul of the operating agreement and devalue their interests.  (*See* Compl. ¶¶ 14, 18.)  Dietrich made the change anyway.  (*See* Compl. ¶ 18.)[1]

8.     A few months later, the Richardsons made a written demand to inspect Utili-Serve's records and to audit its books under section 11.1 of the operating agreement and N.C.G.S. § 57D-3-04.  (*See* Compl. ¶ 19; Compl. Ex. 2 at 1, 6–7, ECF No. 3.2.)  They specified thirty-eight categories of requested records, ostensibly to ascertain the company's financial condition, to investigate self-dealing and other

---

[1] Dietrich claims that he amended Utili-Serve's operating agreement in January 2020 to permit or ratify the change in tax status.  This document, which is attached to the motion to dismiss, is signed only by Dietrich and states that it is "effective as of the Effective Date without the need for its execution by any of the Class B Members."  (Defs.' Ex. 1 at p.16 n.*, ECF No. 9.)  The Richardsons say that this is the first time they've seen an executed copy.  (S*ee* Pls.' Opp'n to Mots. to Dismiss & for Sanctions 4 n.1, ECF No. 14 ["Pls.' MTD Opp'n"].)  This amendment, if valid, does not alter the relevant terms of the operating agreement, and neither side has suggested that it has any effect on the asserted claims or pending motions.

improprieties by Dietrich, and to determine the value of the members' interests. (*See generally* Compl. Ex. 2.) Dated May 1, 2020, the letter called for a response within two weeks. (Compl. Ex. 2 at 7.)

9. Utili-Serve responded on May 12. (Compl. ¶ 20; *see also* Compl. Ex. 3, ECF No. 3.3.) It stated that, after receiving the demand, Dietrich "determine[d] it is in the Company's best interest to amend" section 11.1 of the operating agreement. (Compl. Ex. 3 at 3.) Without notice to the Richardsons and without their consent, Dietrich rewrote section 11.1 to eliminate the Class B members' audit right altogether and to narrow their inspection right so that it mirrors section 57D-3-04(a). (*See* Compl. ¶ 20; Compl. Ex. 3 at 5–7.)[2] On that basis, the company agreed to produce a few documents—the articles of organization, some financial statements, and one or two others—but said the rest were "not within the scope of N.C.G.S. § 57D-3-04" and therefore not open to inspection or audit. (Compl. Ex. 3 at 3.)

10. Believing that Utili-Serve's response was designed "to prevent them from investigating potential mismanagement," the Richardsons sued. (Compl. ¶ 21.) They ask the Court to exercise its mandamus power to compel an inspection of the requested records. (*See* Compl. ¶ 27.) In addition, they claim that the denial of their inspection and audit demand and the unilateral amendment of section 11.1 are breaches of the operating agreement, the implied duty of good faith and fair dealing, and Dietrich's fiduciary duties. (*See* Compl. ¶¶ 32, 36, 40, 41.)

---

[2] Exhibit 3 contains two documents: Utili-Serve's response letter and the amendment to section 11.4. Pincites are to the .pdf document page numbers, not those of the individual documents.

11.    Dietrich and Utili-Serve have moved to dismiss the complaint for failure to state a claim under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. They have also sought sanctions under Rule 11. (ECF No. 8.) The Richardsons oppose those motions and have moved for a summary order or a preliminary injunction compelling an inspection and an audit. (ECF No. 15.)

12.    The motions have been fully briefed, and the Court held a hearing on October 6, 2020. These matters are ripe for determination.

## II.
## DEFENDANTS' MOTIONS

13.    The motion to dismiss, if granted, would resolve all issues, and so it is the natural place to start. In deciding the motion, the Court takes the allegations of the complaint as true and views the facts and permissible inferences in the light most favorable to the Richardsons. *See, e.g.*, *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 332, 828 S.E.2d 467, 471 (2019). Exhibits to the complaint are deemed to be part of it and may also be considered. *See Krawiec v. Manly*, 370 N.C. 602, 606, 811 S.E.2d 542, 546 (2018); N.C. R. Civ. P. 10(c).

### A. Mandamus Claim for Inspection and Copying

14.    The first claim for relief is for a summary order compelling Utili-Serve to allow the Richardsons to inspect and copy the records specified in the demand letter. (*See* Compl. ¶ 27.) In their opening brief, Dietrich and Utili-Serve argue, without citation, that this "is simply a remedy" and not an independent cause of action. (Defs.' Br. Supp. Mots. to Dismiss & for Sanctions 12, ECF No. 9 ["Defs.' MTD Br"].) They have since abandoned that argument, bowing to decisions holding that an LLC

member may "employ the . . . mandamus power of the courts to enforce his right to inspect company records." *Miller v. Burlington Chem. Co.*, 2016 NCBC LEXIS 190, at \*11 (N.C. Super. Ct. Sept 27, 2016); *see also Amory v. ACTS Contracting, Inc.*, No. 19 CVS 166 ¶¶ 33–37 (N.C. Super. Ct. Apr. 16, 2019).

15. In their reply brief, Dietrich and Utili-Serve argue that the claim is moot because they have agreed to provide some records and the Richardsons are not entitled to more. A claim is moot only "when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy." *Roberts v. Madison Cnty. Realtors Ass'n, Inc.*, 344 N.C. 394, 398–99, 474 S.E.2d 783, 787 (1996) (citation omitted).

16. The chief issue in this case is whether the Richardsons have the right to inspect documents that Utili-Serve refused to provide, which make up the bulk of the demand. That is a live dispute. *See Gvest Real Estate, LLC v. JS Real Estate Invs., LLC*, 2017 NCBC LEXIS 32, at \*7–8 (N.C. Super. Ct. Apr. 6, 2017) (denying motion to dismiss when parties had "live dispute over the scope of [the member's] inspection rights"). The Court therefore denies the motion to dismiss the first claim for relief.

B. Breach of Contract

17. The Richardsons claim that the refusal to allow an inspection and audit was a breach of section 11.1 of the operating agreement. (*See* Compl. ¶ 32.) Dietrich and Utili-Serve move to dismiss the claim because, after receiving the demand, Dietrich amended section 11.1 to narrow the inspection right and excise the audit right.

"Following" the amendment, they contend, there could be no breach. (Defs.' MTD Br. 6–7.)

18. This argument assumes that the amendment is not only valid but also "retroactive," reaching back in time to expunge rights the Richardsons had when they made the demand. (Defs. MTD Br. 7.) The Richardsons respond that a unilateral, retroactive amendment is not enforceable. (*See* Pls.' MTD Opp'n 11–13.) It would certainly raise difficult questions. *See, e.g.*, *Sears Roebuck & Co. v. Avery*, 163 N.C. App. 207, 219, 593 S.E.2d 424, 432 (2004) (citing cases that have "concluded that the power to unilaterally amend contractual provisions without limitation gives rise to an illusory contract"). But the Court need not wade into that issue because the amendment isn't retroactive. On its face, it "is effective the 11 day of May, 2020"— ten days after the Richardsons made their demand. (Compl. Ex. 3 at 5.)

19. Thus, the pertinent question is whether the complaint states a claim for breach of section 11.1 as it existed at the time of the demand. The unamended section 11.1 is broad, allowing any member to "inspect and make copies of the records maintained by" Utili-Serve. (Op. Agrmt. § 11.1.) At no point do Dietrich and Utili-Serve contend that the Richardsons' demand exceeded the operating agreement's scope. They do contend in a footnote that there was no breach because "[s]ection 11.1 imposed no specific obligation as to when inspection must be allowed." (Defs.' MTD Br. 6 n.20.) Had Utili-Serve merely dawdled, it might have a point, but it affirmatively refused the inspection and audit demand. (*See* Compl. ¶¶ 19, 20, 32, Ex. 3.) This written refusal of rights granted by the operating agreement and

properly exercised by the Richardsons is enough to allege a breach. *See, e.g.*, *Profile Invs. No. 25, LLC v. Ammons E. Corp.*, 207 N.C. App. 232, 236–37, 700 S.E.2d 232, 235–36 (2010); *Kezeli v. Logan*, 2015 NCBC LEXIS 31, at *17–18 (N.C. Super. Ct. Mar. 26, 2015).

20. The Court therefore denies the motion to dismiss the claim for breach of contract.

### C. Breach of Implied Duty of Good Faith and Fair Dealing

21. The Richardsons claim that Dietrich's unilateral amendment of section 11.1, without notice, was a breach of the implied duty of good faith and fair dealing. (*See* Compl. ¶¶ 36, 38.) According to Dietrich, section 11.4 of the operating agreement gives him the "clear and unambiguous" power to amend it without the Richardsons' consent. (Defs.' MTD Br. 8–9; *see also* Op. Agrmt. § 11.4.) He and Utili-Serve contend that the implied covenant cannot "override the Operating Agreement's express language, which allowed for the amendment." (Defs.' MTD Br. 9.)

22. If Dietrich and Utili-Serve are right about their interpretation of section 11.4, they may lose more than they gain. The power that Dietrich claims to have is one that courts view with skepticism. When one party to a contract "retains an unlimited right to decide later the nature or extent of his performance," the promise is illusory and unenforceable. *Sears Roebuck*, 163 N.C. App. at 219, 593 S.E.2d at 433 (quoting 1 Walter H.E. Jaeger, *Williston on Contracts* § 43, at 140 (3d ed. 1957)). In other words, construing the operating agreement to give Dietrich the power to

amend it unilaterally and with no duty to do so in good faith would threaten the validity of the disputed amendment.

23. For now, that issue remains in the distance. Nothing in section 11.4 expressly states that Dietrich has the unrestrained power to amend the operating agreement. At this early pleading stage, the Court assumes without deciding that the operating agreement, like "every contract," has "an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985) (citation and quotation marks omitted); *see also* N.C.G.S. § 57D-2-30(e) (stating that "the implied contractual covenant of good faith and fair dealing . . . govern[s] the administration and enforcement of operating agreements").

24. The Court also concludes that the Richardsons have adequately alleged a breach of the implied covenant. The complaint alleges that Dietrich amended section 11.1, without notice, in retaliation for the Richardsons' assertion of their inspection and audit rights and with the intent to extinguish or curtail those rights. (*See* Compl. ¶¶ 36, 38.) The complaint further alleges that Dietrich aimed to insulate himself "from an investigation of potential improprieties in the management of Utili-Serve." (Compl. ¶ 36.) Taking these allegations as true, the Court denies the motion to dismiss the claim for breach of the implied duty of good faith and fair dealing. *See, e.g., Maglione v. Aegis Fam. Health Ctrs.*, 168 N.C. App. 49, 58, 607 S.E.2d 286, 292 (2005) (concluding that there was evidence of breach of covenant of good faith and

fair dealing when the defendant exercised discretionary authority to switch a "bonus calculation method" without notice and with improper motives).

### D. Breach of Fiduciary Duty

25.     The fourth claim is for breach of fiduciary duty against Dietrich, again premised on his amendment of section 11.1.  To state a claim for breach of fiduciary duty, a plaintiff must allege the existence of a fiduciary duty, a breach of that duty, and an injury proximately caused by the breach.  *See Green v. Freeman*, 367 N.C. 136, 141, 749 S.E.2d 262, 268 (2013).  Dietrich challenges only the first element.  (*See* Defs.' MTD Br. 9–10.)

26.     The usual rule is that members of an LLC do not owe fiduciary duties to one another.  An exception is that the "holder of a majority interest who exercises control over the LLC owes a fiduciary duty to the minority interest members."  *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at *17 (N.C. Super. Ct. June 19, 2019) (quoting *Fiske v. Kieffer*, 2016 NCBC LEXIS 22, at *9 (N.C. Super. Ct. Mar. 9, 2016)); *see also Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 473, 675 S.E.2d 133, 137 (2009).

27.     Here, Dietrich is Utili-Serve's majority member and its only manager.  (Compl. ¶ 13; Op. Agrmt. Schedule 1.)  He possesses all voting and managerial rights to the exclusion of the other members. (*See* Op. Agrmt. § 2.1 ("*Member*"), 3.1, 4.2, 4.3, 4.4.)  And he has the sole authority to sell the company's assets while claiming to have the power to amend the operating agreement without consent of the other members.  (*See* Op. Agrmt. §§ 9.1, 11.4.)  In Dietrich's own words, he has "plenary

power," and the Richardsons have "no voting, management, or operational rights." (Defs.' MTD Br. 11.) The facts stated in the complaint, along with the provisions of the operating agreement, suffice to allege that Dietrich is Utili-Serve's controlling member. *See Vanguard Pai Lung*, 2019 NCBC LEXIS 39, at \*19–20; *Plasman v. Decca Furniture (USA), Inc.*, 2016 NCBC LEXIS 80, at \*25 (N.C. Super. Ct. Oct. 21, 2016).

28. Dietrich also argues that he acted in his capacity as manager, not as majority member. (*See* Defs.' MTD Br. 9–12.) The complaint alleges otherwise. (*See, e.g.*, Compl. ¶¶ 13, 20, 40, 41.) And indeed, Dietrich signed the amendment twice, once as the Class A member and once as manager. (*See* Compl. Ex. 3.)

29. The Court therefore denies the motion to dismiss the claim for breach of fiduciary duty.

### E. Rule 11

30. Rule 11 sanctions may be imposed when a pleading is not well grounded in fact, lacks legal sufficiency, or was filed for an improper purpose. *See* N.C. R. Civ. P. 11(a); *Bryson v. Sullivan*, 330 N.C. 644, 655, 412 S.E.2d 327, 332 (1992). Dietrich and Utili-Serve argue that the Richardsons' claims lack a factual or legal basis "[f]or the reasons set forth in support of [the] motion to dismiss." (Defs. MTD Br. 13.) Having denied the motion to dismiss, the Court finds no basis for imposing sanctions and denies that motion too.

## III.
## PLAINTIFFS' MOTION

31.     Next, the Court turns to the Richardsons' motion for summary relief or for a preliminary injunction.  They ask for an order to compel Utili-Serve to allow an inspection of its records and an audit of its books.  (*See* Pls.' Br. Supp. Mot. Summ. Relief or Prelim. Inj. 9, ECF No. 16.)  At the hearing, counsel for the Richardsons confirmed that their request for summary relief, grounded in the Court's mandamus power, is limited to the inspection right.

### A. Mandamus

32.     By statute, an LLC member has a qualified right to inspect and copy the company's records.  *See* N.C.G.S. § 57D-3-04(a).  An operating agreement may expand the members' inspection rights but cannot diminish them.  *See id.* § 57D-2-30(b)(4). "Thus, when determining whether a member has a right to access requested information, a court must look to section 57D-3-04 and to the LLC's operating agreement." *Miller*, 2016 NCBC LEXIS 190, at *12.  Although no statute creates an express cause of action for an LLC member to enforce his inspection rights, the mandamus power of the courts is available for that purpose, including to enforce greater access allowed by the operating agreement. *See id.* *11, 18–19; *Amory*, No. 19 CVS 166 ¶¶ 33–37.

33.     A writ of mandamus is a court order "to a board, corporation, inferior court, officer or person commanding the performance of a specified official duty imposed by law." *Morningstar Marinas/Eaton Ferry, LLC v. Warren Cnty.*, 368 N.C. 360, 364, 777 S.E.2d 733, 736 (2015) (citation and quotation marks omitted).  Mandamus is

appropriate when (1) the petitioner has a "clear legal right to the act requested," (2) the respondent has a "legal duty to perform the act," (3) performance of the act is "ministerial in nature and does not involve the exercise of discretion," (4) the respondent "did not perform the act" and "the time for performance has expired," and (5) there is no "alternative, legally adequate remedy" available. *Id.* (citation, quotation marks, and alternations omitted).

34. The material facts are undisputed.[3] At the time the Richardsons made their demand, the operating agreement allowed any member to "inspect and make copies of the records maintained by" Utili-Serve, without exception. (Op. Agrmt. § 11.1.) They requested thirty-eight categories of records, including financial statements, company credit card statements, employee paystubs, expense reports, bank statements, lease agreements, documents related to Utili-Serve's change in tax status, and other documents related to specified transactions involving Dietrich and his family. (*See* Compl. Ex. 2 at 2–7; Richardson Aff. ¶¶ 13, 14, ECF No. 16.1.) With few exceptions, Utili-Serve denied that request. (*See* Compl. Ex. 3 at 2–4; Richardson Aff. ¶¶ 15, 16.) The denial was based on Dietrich's decision—after receiving the demand—to amend and narrow section 11.1 so that each member may inspect

---

[3] Most of the testimony from the parties' affidavits is irrelevant, featuring back-and-forth arguments over whether Dietrich engaged in misconduct and whether the Richardsons miscalculated certain distributions and offsets. (*See, e.g.*, ECF No. 16.1 ¶¶ 6–11, 18; ECF No. 20 ¶¶ 8, 9, 11–22; ECF No. 21.2 ¶¶ 2–7, 9; ECF No. 21.3 ¶¶ 2–5; ECF No. 23 ¶¶ 2–10.) These exchanges have no bearing on the scope of the Richardsons' inspection right, and the merits of any potential direct or derivative claims for alleged wrongdoing are not before the Court in this case.

company records only as "required under [N.C.G.S.] § 57D-3-04(a)." (Compl. Ex. 3 at 6; *see also* Compl. Ex. 3 at 3; Dietrich Aff. ¶ 10, ECF No. 20.)

35. Without question, the broad language of section 11.1 gave the Richardsons the right to inspect the requested records at the time of their demand. The only argument offered by Dietrich and Utili-Serve is that section 11.1 "as amended" is narrower. (*See, e.g.*, Defs.' Opp'n Mot. Summ. Relief or Prelim. Inj. 1, 9–13, ECF No. 19 ["Defs.' PI Opp'n"].) As discussed, though, the amendment is not retroactive. Even assuming Dietrich had the unilateral power to extinguish rights already claimed and exercised (which is not at all clear), he did not do so. The amendment, if valid, became effective on May 11 and going forward. When the Richardsons invoked their inspection right on May 1, that right vested and was unaffected by the purported amendment. The Richardsons were entitled to inspect the requested records at that time and are now entitled to enforce that right.

36. Dietrich and Utili-Serve do not make any other arguments. In passing, they refer to the amendment of section 11.1 as a "clarifying" amendment, presumably suggesting that section 11.1's scope was always the same as that of section 57D-3-04. (*See* Defs.' PI Opp'n 4; Dietrich Aff. ¶ 10.) No reasonable reader could read the language in that way. The amendment was narrowing, not clarifying.

37. Dietrich and Utili-Serve also question the purpose of the demand. (*See generally* Defs.' PI Opp'n.) They stop short of saying the Richardsons' purpose is disqualifying, though. In any event, section 11.1 does not expressly require a member making an inspection request to have any particular purpose, and this Court has held

that a shareholder's effort to investigate possible mismanagement or misappropriation by corporate leadership—the purpose the Richardsons have articulated here, (*see* Richardson Aff. ¶¶ 6–11, 13, 14, 16–18)—is a proper purpose in the analogous area of shareholder inspection rights. *See Sharman v. Fortran Corp.*, 2018 NCBC LEXIS 27, at *14–15 (N.C. Super. Ct. Apr. 2, 2018).

38. The Court concludes, based on the undisputed material facts, that the requirements for mandamus relief have been met. When the Richardsons made their request on May 1, they had an unqualified contractual right to the records they requested. Utili-Serve had no discretion to refuse, yet the evidence is undisputed that Utili-Serve has not complied and has refused the demand. The Court therefore grants the Richardsons' motion for summary relief to enforce their inspection right under the operating agreement. The Court need not and does not decide whether section 57D-3-04 also supports their claim to the requested records.

39. Neither side has directly addressed whether the requested records are confidential. It seems safe to assume that some of the records, touching on financial matters, are sensitive. In its discretion, the Court will allow the parties to negotiate a protective order and will condition access to the records on reasonable safeguards to protect any sensitive information from dissemination.

B. Preliminary Injunction

40. The Richardsons also ask the Court to enter a preliminary injunction compelling Utili-Serve to allow an audit of its books. A preliminary injunction's purpose is to preserve the status quo during litigation. *See A.E.P. Indus., Inc. v.*

*McClure*, 308 N.C. 393, 401, 302 S.E.2d 754, 759 (1983) (citation omitted). It is proper only when the plaintiff can show a likelihood of success on the merits and a likelihood of irreparable harm. *See id.* at 401, 302 S.E.2d at 759–60. Because the Richardsons seek a mandatory preliminary injunction, their burden is heightened: the case must be "urgent"; the right must be "clear"; and the injury must be "immediate, pressing, irreparable, and clearly established." *Auto. Dealer Res., Inc. v. Occidental Life Ins. Co. of N.C.*, 15 N.C. App. 634, 639, 190 S.E.2d 729, 732 (1972) (citations and quotation marks omitted).

41. Even if the Richardsons are likely to succeed on the merits, they have failed to show irreparable harm. Neither their opening brief nor their reply brief adequately articulates any immediate and pressing harm that an injunction can prevent. If some harm exists, it seems likely that access to the requested records will lessen the blow. In short, the Richardsons have not carried their heightened burden, and the Court denies the request for a mandatory injunction compelling an audit of Utili-Serve's books.

IV.
CONCLUSION

42. The Court **DENIES** Dietrich and Utili-Serve's motions to dismiss and for Rule 11 sanctions.

43. The Court **GRANTS** in part and **DENIES** in part the Richardsons' motion for summary and expedited relief or, in the alternative, for preliminary injunction and **ORDERS** as follows:

a. The parties shall file either a jointly proposed consent protective order or separately proposed orders for the Court's consideration no later than December 4, 2020.

b. No later than fourteen days after the Court's entry of the consent protective order, Utili-Serve shall make available to the Richardsons all documents specified in the May 1, 2020 demand letter located at ECF No. 3.2.

c. In all other respects, the Court **DENIES** the Richardsons' motion.

44. The Court further **ORDERS** that no later than December 4, 2020, the parties shall conduct a case management meeting, with their case management report and proposed case management order due no later than fourteen days thereafter. *See* Business Court Rules ("BCR") 9.1, 9.2. In addition to the matters specifically listed in BCR 9, the report should address what matters remain for resolution by the Court.

      **SO ORDERED**, this the 17th day of November, 2020.

                  /s/ Adam M. Conrad
                  Adam M. Conrad
                  Special Superior Court Judge
                   for Complex Business Cases